## H. C. FITZPATRICK v. ALEXANDER POPE.

1. It is error to consolidate two suits not between the same parties nor founded on the same subject matter.
2. It is error to consolidate a suit by one heir against the administrator of his father's estate, for money alleged to have been in the father's safe at

his death, and which was appropriated by the administrator, with a suit against the administrator and the plaintiff in the former suit for partition of the estate.

3. An instrument improperly admitted to record cannot be proved by certified copy under the statute.

4. If personal property be conveyed to trustees subject to be used for the support of the trustees and their children, the accumulated profits arising from the property, after supplying the uses charged upon it, become the property of the trustees.

5. If such trustees be husband and wife, and the profits be the gains from the labor of slaves (the trust property), then such profits are community property.

6. Such community property upon the death of the parties would go, the one-half divided among the heirs of the husband, the other half among the heirs of the wife.

7. See this case for construction of a trust deed.

APPEAL from Harrison. Tried below before the Hon. J. B. Williamson.

H. C. Fitzpatrick brought suit on the twenty-eighth of January, 1867, against Alexander Pope, for four thousand dollars gold coin, alleged to have been on deposit in the iron safe of Rene Fitzpatrick at his death; alleging that Rene Fitzpatrick died about January, 1867; that Pope was appointed his administrator, and took possession of said coin, after knowing plaintiff's claim, and refused to return it on demand.

Pope answered in this suit that the money was the property of the estate; that as administrator he had taken possession of the money.

Mrs. T. A. Jones was also joined with Pope, as administratrix, and in the suit, and having pleaded some other matters of defense, adopted Pope's answer.

On twenty-third of August, 1869, the suit of T. A. Jones et al. v. H. C. Fitzpatrick et al. was brought; and soon thereafter the plaintiffs in this suit filed a motion to consolidate it with the suit of Fitzpatrick v. Pope.

This motion was resisted by H. C. Fitzpatrick.

This last suit was brought on what was called a deed of trust, executed by Isaac Browning to Rene Fitzpatrick and his wife Mildred, in 1843, under which it was claimed that all the property which Rene Fitzpatrick had in possession at his death was trust property. It was charged that the $4000 coin, the subject matter of the first suit, was part of the trust fund, as also was a tract of land occupied by H. C. Fitzpatrick.

The plaintiffs in the last suit asked the court to construe the deed of trust, to decree the land and money *trust property*, and divide it according to the provisions of the deed. Besides the land and the money in controversy in the first suit was a large amount of money and personal property, charged to have been the proceeds of the labor of slaves mentioned in the trust deed.

To this petition (in the second suit) H. C. Fitzpatrick answered, denying all the main allegations in the petition, and alleging fraud; that he was the owner of the land occupied by him under the will of his mother, whose separate property it was; also the statute of limitations of three, five and ten years; and that his mother, under whom he claimed, had never signed the trust deed, or accepted it as trustee.

Rene Fitzpatrick had been married three times, by each of which marriages he had children. At the date of the trust deed, in 1843, he was living with his last wife, Mildred, the mother of the defendants. H. C. Fitzpatrick, Mahone Fitzpatrick, and Mildred J., were joined in the suit with Pope, administrator in the suit instituted by Jones *et al.*

From their immigration to Texas, in 1842, until her death, Mildred and Rene had lived together as husband and wife, and during that period the property claimed in the suit was acquired. The children of the first two marriages joined Mrs. Jones as plaintiffs.

The deed of trust is as follows :

"This indenture of three parts, made this fourth day of January, A. D. 1843, between Isaac E. Browning, of the county of Red River and Republic of Texas, of the first part; Rene Fitzpatrick, of the same county and republic, and Mildred, his wife, of the second part; and Felix G. Fitzpatrick, of the same county and republic, of the third part, witnesseth: That in consideration of the sum of fourteen thousand dollars, paid by the said Felix G. Fitzpatrick, son of the said Rene Fitzpatrick, for settling and assuring all and singular the slaves and other property hereinafter named and mentioned, unto such uses and upon such trusts as hereinafter expressed and declared, the receipt and payment of which sum the said Isaac E. Browning doth hereby acknowledge; the said Felix G. Fitzpatrick, for himself, his heirs, executors and administrators, releasing and renouncing all his existing right, title and claim in and to said slaves and other property, and forever barring and estopping the setting up of any such right, title and claim on the part of himself, his heirs, executors and administrators, so far as the same may be incompatible with the true intent and object of this indenture and the uses and trust herein expressed and declared; but by no means precluding himself, his heirs, executors or administrators, from his joint share in the division hereinafter named; all which is testified by the said Felix G. Fitzpatrick being a party thereto, and his ensealing and delivering of these presents; he, the said Isaac E. Browning, hath given, granted, bargained, sold and confirmed, and by these presents doth give, grant, bargain, sell and confirm unto the said Rene Fitzpatrick, and Mildred, his wife, all and singular the following named and described slaves and other property, to-wit: "

(Here follows a description of the property, consisting of slaves, wagon and mules, etc.)

"To have and to hold all and singular the slaves and other property hereinbefore named and described to the said Rene and Mildred, to such uses and upon such trust, and to and for such intents and purposes as are herein expressed and declared, of and concerning the same; that is to say, to the use and behoof of the said Rene and Mildred during their joint lives, and for the support, maintenance and education of the children of the said Rene, as well those now living as those hereafter to be born, being the heirs of his body lawfully issuing, and their heirs, all the aforesaid slaves and property, to be managed, controlled and administered by the said Rene and Mildred during their joint lives, for the uses and purposes aforesaid, according to their own judgment and discretion, and in manner aforesaid, by the said Rene, should he survive and overlive his said wife, to his own use and behoof, as well as for the other uses and purposes aforesaid, during the full term of his natural life. Should said Mildred survive and overlive her said husband, then she is to have and hold all the aforesaid slaves and property, and to manage, control and administer the same, according to her own judgment and discretion, to her own use and behoof, and for the support, education and maintenance of the aforesaid children of said Rene, and their heirs, during the full term of her natural life, if she so long remain unmarried and the widow of said Rene. In case the said Mildred surviving her said husband should die his widow, then at the time of her death, or the said Rene surviving, then at the time of his death, the slaves and property, with the increase thereof, shall be equally divided among all the aforesaid children of said Rene, share and share alike, except Thurza Ann, the oldest daughter of said Rene, now the wife of James

Jones, of Macon county, Alabama, who has received two slaves, valued at .twelve hundred dollars, by way of advancement and as a part of her share, and who is to receive only such an additional portion as will make her share an equal one with the rest. And in case any, of the aforesaid children shall die before such division, then the portion of such deceased child shall belong to the lawful heirs of his or her body, or in default of such shall be divided among the surviving children of said Rene, in manner aforesaid. In case the said Mildred, surviving her said husband, should again marry, then aforesaid slaves and property, with the increase thereof, are to be divided in manner aforesaid, between herself and the aforesaid children of said Rene, share and share alike, or their heirs aforesaid, subject to the exception aforesaid relating to the said Thurza Ann; and she, the said Mildred, is to have her choice out of all the said slaves and their increase, to make up her share, which shall be appraised and assigned to her in manner hereinafter described and expressed. The said Rene and Mildred, or either of them, surviving, may at any time give off to any of the aforesaid children or heirs, his, her or their portion, or any part thereof, which shall be taken into consideration, and the proper allowance made therefor, in the final division of said slaves and property, in every division of said slaves and property, in manner aforesaid; or in giving off any portion or part thereof, to any of said children or heirs, the same shall be done, and the said slaves and other property, with the increase thereof, shall be divided, assigned, valued and distributed by two or three disinterested men, to be appointed by said Rene and Mildred, or either of them, at any time previous to such division. To avoid any misconstruction of this instrument, it is expressly declared to be the intent and meaning thereof, that in case of the death of any child of said

Rene, all the lawful heirs of the body of such child shall collectively be entitled to that portion only, in any division aforesaid, which would have belonged to said child if living.

" And the said Rene and Mildred on their part hereby accept this conveyance, subject to the uses, trust and purposes hereinbefore expressed and contained; all which they and each of them covenant to observe, perform and carry into effect, according to the true intendment and tenor of this indenture.

" In testimony whereof the parties aforesaid have hereunto set their hands and seals, the day and year first above written.

" Executed and delivered in the presence of

" JAMES H. JOHNSTON,

" GIDEON MIMS, J. P.

" ISAAC E. BROWNING,    [Seal]

" FELIX G. FITZPATRICK, [Seal]

" RENE FITZPATRICK,    [Seal]

" MILDRED FITZPATRICK [Seal]

" By RENE FITZPATRICK, her husband."

This trust deed was proved for record by Gideon Mims, one of the subscribing witnesses, was recorded, and a certified copy from the record produced in evidence.

*James Turner*, for appellant.—The court erred in consolidating the suits.

The authority given to courts in this State to consolidate causes is limited to a single provision of the statute, and for no other cause and under no other circumstances can suits be legally consolidated; and even when the statutory reason exists, it is still left to the discretion of the judge whether he will consolidate or not. " Whenever several suits may be pending, or brought by the same

plaintiff against the same defendant, for causes of action that may be joined, the district judge, at his discretion, on motion may consolidate them." (Paschal's Digest, Art. 1451.) And from this statute, and this alone, the right to consolidate any cause must be deduced. Our courts have indeed decided that where the parties are the same, and the actions similar, that the plaintiff in the one suit might be defendant in the other, and the causes consolidated. Such is the spirit of the law. Two things must concur before the suits can be joined; first, the parties must be the same; second, the causes of action must be such that both might have been joined in a single petition or plead in offset to each other.

The suits must be founded on causes of action that could have been joined. If A. sue B. on a note, and again upon an account or another note, on motion of B. the causes should be consolidated. But if either suit were for land or other property, then the suits should not be consolidated, because they could not have been joined in the first instance. When the same plea may be pleaded, and the same judgment given on all the demands, they may be joined ¦in one action (Chevallier v. Rusk, Dallam, 611); and if the bill demands several matters of different natures or against different defendants, it is multifarious. (Dallam, 619.) The statute leaves no escape from the conclusion that suits can only be consolidated when the parties are the same, and on like causes of action. The law abhors a multitude of suits, but it no less abhors multifarious suits. Test the suit at bar by the statute, and there can be no doubt of the result. No good could possibly come of trying the suits together, and the multitude of details were calculated to confuse the minds of the jury. Either suit presents a mass of matter that is fully sufficient to test the ability of any jury, and of most lawyers.

The motion to consolidate should not have been granted; in fact, the district judge had no legal power to consolidate them. Every citizen has the right to have his complaints heard and determined in a court of competent jurisdiction without unnecessary delay, and without having his cause mixed and interwoven with others to which it has no reference.

    *      *      *      *      *      *      *

I now propose to consider the second branch of the case, or the case of Jones *et al.* v. Fitzpatrick *et al.*; for I find here, as in the court below, it is impossible to consider the two cases as one, or as branches of the same case. Consolidate them as we will, they are still two cases, with different parties and with different purposes in view. But they are together, and must of necessity be so considered.

And first in order is the demurrer to plaintiffs' petition; that is, the petition of T. A. Jones *et al.* v. H. C. Fitzpatrick *et al.* The petition claims all the property and money Rene Fitzpatrick and wife died possessed of by virtue of an instrument in writing signed by Felix G. Fitzpatrick, Isaac Browning, Rene Fitzpatrick, and Mildred Fitzpatrick by her husband.

On the proper construction of this instrument the issue on demurrer is joined. If the object of the parties was to convey the property to Rene and wife for a particular purpose, or in trust for a particular purpose, and the trust being performed to divide the body of the property with the surplus profits among the children, then the demurrer should have been overruled. But if the purpose was to grant a life estate to Rene and wife, or was to convey the property in trust to them, with the beneficial interest in the profit, coupled with a condition for the support and maintenance of the children, then the surplus profits belonged to Rene and wife, and the demurrer

should have been sustained. None of the original property was in possession at the time of Rene's death; the reason of which will be apparent, the bulk of the property being negro slaves. The contest is exclusively concerning the profits, the proceeds of the labor of the slaves, it being contended on the part of the plaintiffs in that suit, that from year to year as a surplus was accumulated, it became a part of the trust property; and by the other party, that after the conditions were performed the accruing surplus belonged to Rene and wife under this deed.

Rene Fitzpatrick, as shown by the petition, was married three times, by each of which marriages he had children. The children of the two first marriages are plaintiffs with Mrs. Jones, and the children of the third defendants with H. C. Fitzpatrick; that after their marriage, Rene and Mildred Fitzpatrick resided for a time in Alabama, and removed to Texas in 1842; that the deed of trust, as it is termed, was executed January 4, 1843; that Rene and his wife held possession of the property until the slaves were emancipated, and that the money and property were the proceeds of their labor.

After describing the property, the instrument proceeds as follows: "To the use and behoof of the said Rene and Mildred during their joint lives, and for the support, maintenance and education of the children of the said Rene, as well those now living as those hereafter to be born; * * to be managed, controlled and administered by the said Rene and Mildred during their joint lives, for the uses and purposes aforesaid, according to their own judgment." In case Rene should survive his wife, he is to have the property, "to his own use and behoof for the term of his natural life;" and in case the wife survives, "she is to have, hold, administer and control the same, according to her own judgment, for her own use and be-

hoof, and for the support, maintenance and education of the children during the full term of her natural life;" and finally concludes with the condition that at their death the property and its increase was to go to the children. As the proper signification or meaning of the word increase will enable us to arrive at the true meaning of the parties to the instrument, it would be best first to understand the legal import of the term ; and just here I would remark that there is a vast difference between the term increase and proceeds ; the one indicates the natural reproduction of animals in the regular order of nature, as also the growth in size and strength ; the other signifies the profits arising therefrom. In our statute, concerning marital rights, the increase of separate property remains separate while the proceeds become community. The meaning of the word increase, as a legal term, was not fairly before the courts for determination until the case of De Blane v. Lynch came up, although in the case of Howard v. York, 20 Texas, 670, Judge Roberts seemed to have no doubt that the term increase, as applied to cattle, meant their production in the order of nature. In the case of De Blane v. Lynch, 23 Texas, 26, the question was fairly made, and the court has fairly determined it. It seems that Lynch, having judgment against De Blane, levied an execution upon cotton bales that were grown upon land the separate property of Madame De Blane, and produced by the labor of slaves, also her separate property; and consequently she claimed the cotton as her separate property. The whole question as to whether the cotton was liable, under the execution depended upon whether it was separate or community property, and that in its turn depended entirely upon the meaning of the term increase. The court, Judge Bell delivering the opinion, decided that the cotton was liable; that it was community property; that cotton produced

by slave labor was not the increase of the slave, but proceeds, profits or revenues arising from his labor; that it was neither increase of land nor produce being raised thereon, but proceeds or profits arising therefrom.

It is insisted that all this surplus on hand, when the estate of Rene Fitzpatrick terminated with his life, was the increase of the slaves held in trust by him, and as such a part of the body of property to be divided under the deed.    I have heard of mountains in labor bringing forth mice, but until now I have never heard that a number of negro slaves could increase in the form of mules, cotton, money and land.    I suppose that if a woman were to cultivate and gather a bale of cotton, and purchase flour, meal and meat with the money for which she sold it, that she, cannibal like, would feed herself upon her own increase; and if with the price she had purchased a mule, we would have the increase of the woman in the form of a mule.    Yet as ridiculous as the idea seems, it is the position announced in the petition.

It seems a fact apparent upon the face of the paper itself that it was the intention of the grantor to preserve the body of the property intact and give to the old people its use and enjoyment for life.    Had he intended to create a trust on the profits, how easy would it have been to insert the words; but he conveys a life estate, to their "own use and behoof;" then follows the only trust that is expressed, the only condition that is annexed—"that out of the property they must support and educate the children."    While there was no power in them to dispose of the body of the property, the largest and most untrammeled discretion was given them to manage it as they thought best.    The property is given them for life, to manage and control in any manner that to them seemed best, to their own use and behoof.    The word behoof means advantage, benefit, etc.    Then we have it to their own use,

benefit or advantage. But there is a condition; they must support the children, and, finally, the property and its increase is in trust for all the children. The paper is not strictly a deed of trust. In the use of the property it conveys an estate for life, coupled with the support and education of the children.

Now we know that if this property and its proceeds were strictly in trust, any waste of either the property or the profits would demand the interference of the courts. The trustee might be removed, and the property taken away from him, but in this case a court would have no right to intefere, if the trustees only expended the proceeds of the property, provided the children were supported. Rene and wife could have given away every dollar of the surplus and no violation of the terms of the agreement would have ocurred. Again, suppose Rene had so managed the property that after complying with the terms and conditions no surplus remained, could the children or any number of them have maintained a bill for the removal of the trustee, or for taking the property out of his hands? Most assuredly not, because they are vested with full power to manage and control the property during their lives as to them seemed best. If they thought best to have the propety badly managed, well and good; they have the life estate, and no one can dictate as to how they shall use it. If A. grants an estate for life or for a term of years to B., and insert, that out of the property he shall support, maintain and educate C. and himself, there being nothing in the deed to show how the property will vest after the term has expired, would the heir of A. have a right to dictate to B. how he must manage the estate or have the surplus profits arising from it? Or could he apply to have B. removed from the possession of the property merely because it failed to yield full profits; or would C. have any claims on the property

after he was supported and educated? But if B. so managed and used his estate as to paramountly injure the property, the heir would be entitled to his injunction to restrain the unlawful use of the property. In case C. was not provided for according to the terms of the grant, he could maintain his action therefor, or, if necessary, have a receiver appointed to manage the property, so as to insure C. the support and maintenance required by the grant. If instead of the support and education of the children this instrument had provided that Rene and Mildred should pay each of the children fifty dollars per annum, but worded in other respects as this paper is worded, what then would have become of the surplus? Surely the money paid to the children would be held as rent or hire of the property, and the surplus would have vested in Rene and Mildred.

*McKay & Steadman*, for appellee.—The appellant's counsel raises the question of the construction of the deed of settlement, in his discussion of the demurrer to the petition in the case of Jones *et al.* v. Fitzpatrick *et al.* The deed was executed on the fourth of January, 1843, and is a conveyance by Isaac E. Browning to Rene and Mildred Fitzpatrick, of certain slaves and other property, in consideration of $14,000 paid by Felix Fitzpatrick, a son of Rene. The property is conveyed to them "to such use, and upon such trust, and to and for such intents and purposes as are herein expressed and declared, of and concerning the same; that is to say, to the use and behoof of the said Rene and Mildred, during their joint lives, and for the support, maintenance and education of the children of said Rene, and to be managed, controlled and administered by the said Rene and Mildred during their joint lives, for the use and purposes aforesaid, according to their own judgment and discretion." Like provision

is made for the management and control of the property by Rene, in case he survived his wife, and by Mildred in the event she survived her husband. It is then provided, in case of the death of Rene and Mildred, that "the said slaves and property, together with the increase thereof, shall be equally divided among all the children of the said Rene, share and share alike." It is also provided that said Rene and Mildred, or either of them surviving, "may at any time give off to any of the aforesaid children his, her or their portion, or any part thereof, which shall be taken into consideration, and the proper allowances made therefor in the final division of said slaves and property." Mildred Fitzpatrick was the third wife of Rene, who had children by both of his former wives, and it will be observed that the deed carefully provides for all his children. The property embraced in the deed belonged to Rene, in Alabama, in his separate right, and of course it remained his when he came to Texas. He was largely indebted in Alabama, and how the property became vested in Browning does not appear. All that is ascertained upon that subject is, that the property was conveyed by Browning in consideration of $14,000 paid him by Felix G. Fitzpatrick, who was a child of Rene's first wife. The *corpus* of the property conveyed has been entirely destroyed, and this controversy is respecting the proceeds, gains and profits of that property.

The appellant and his co-heirs, the children of the last marriage, contend that these gains were community property of their father and mother ; that they are therefore entitled to one-half thereof, in right of their mother, and that they are entitled to share equally with their elder brothers and sisters in the other half ; while the children of the former marriages (the appellees) claim that these proceeds and gains constitute a part of the trust property, and as such are distributable among all the children

of Rene Fitzpatrick, those of the former marriages as well as those of the last marriage. There were five children by the first marriage, one by the second, and three by the last, making nine in all. The counsel for the appellant thinks that the question was determined in his favor by the case of De Blane v. Lynch, 23 Texas, 25; but it is respectfully submitted that the question in that case has no bearing upon the one before the court in this. The question there was as to the legal construction of the words, "increase of land," used in the act of 1848, regulating marital rights; while here the inquiry is, what was the intention of the parties to an instrument, in using the word "increase," in settling the respective rights of the *cestui que trust* in the property embraced in the instrument. The controlling point in this case is, that the intention of the parties must prevail, if it contravene no rule of law. All contracts, but more especially in marriage settlements (and this can be considered in no other light than a postnuptial settlement), like wills, are liberally construed, so as to effectuate the purposes for which they were made, especially so as to protect the interests of that party for whose benefit they are made. (Atherley 27 Law Lib., 48, 58, 64; Blake v. Irwin, 3 Kelly, Ga., 367; Lewin on Trusts, 100, 103; 1 Kern., 50, 52.) No general rule can be laid down for the construction of such instruments, but each must be construed upon its own terms, and in view of its own surroundings. Therefore, the construction placed by the court upon the language of a statute can furnish no aid in determining what was meant and intended by the employment of the same language in a marriage settlement or deed of trust. The question, therefore, is, what was the intention of the parties to this deed?—as this, as collected from the deed itself and the surrounding circumstances, must control.

The appellant pleaded that the deed was made to de-

fraud Rene Fitzpatrick's creditors. Admitting this to be true, no advantage could be taken of it by any party to this proceeding. Creditors might assail it, but volunteers never. It is undeniably true that Rene was largely indebted in Alabama. The property was run off from that State by Browning for him, and that the deed was made soon after his arrival in Texas. The object of the deed was to provide for Rene and wife and his children, and the remainder, after those purposes were satisfied, was to be divided among his children. Another object was to place the property beyond the reach of creditors. Now if the proceeds of the property were community, as insisted by appellant, then they were subject to be seized by Rene's creditors for the payment of their debts, and the very purpose for which the deed was made would be defeated by its own provisions.

Rene Fitzpatrick bought the land in controversy in December, 1843, and took the bond for title to himself as trustee for his wife. From 1843 to 1859 the property was rendered by him as trustee for his wife and children. When the sheriff applied to him for property to levy upon for a debt, he informed him, in the presence of his wife, that the property was held by him as trustee for her and his children; and both he and his wife managed, controlled and held the property, under the trust deed, from its date in 1843 to her death in 1863 and his in 1867. It will be seen by reference to the deed that mules, wagons and gear are embraced in the deed, as well as slaves. The word "increase" is used in reference to that property as well as the slaves, and it is difficult to see what the increase of that property would be unless it were the proceeds. These facts, it is submitted, in addition to the terms of the deed itself, sufficiently indicate the intention of the parties to be, that the surplus proceeds of the property should, with the *corpus*, be distributed among all of

Rene's children.   Besides it may be suggested that Felix Fitzpatrick, who paid the consideration money of the deed (the jury so found), would not likely have consented to an arrangement by which he and his co-heirs were deprived of any share in the accumulations of the property.

WALKER, J.—The discussion of this case upon the briefs, though very learned and able, has taken a range much wider than that to which we propose confining our opinion.

H. C. Fitzpatrick brought his suit against A. Pope, the administrator of Rene Fitzpatrick's estate, in January, 1867, claiming a personal judgment for $4000 gold coin. H. C. Fitzpatrick claims that there was $4000 gold coin belonging to him in the safe of Rene Fitzpatrick on the first of January, 1867, when Rene Fitzpatrick departed this life, and that Pope took wrongful possession of said sum of money, and refused to return it to the plaintiff on demand.   Pope's defense to this suit is, that he is the administrator of the estate of Rene Fitzpatrick, deceased, and that the money, to-wit, the $4000 gold coin, is the property of said estate, and that he legally holds the same as the administrator.

Mrs. P. A. Jones, who was joined in the administration with Pope, was permitted to make herself a party defendant to this suit, and adopts Pope's answer.

Two years after the commencement of this suit another action was commenced by P. A. Jones et al. against H. C. Fitzpatrick et al.   It may here be observed that Rene Fitzpatrick was formerly a resident of the State of Alabama; that he was three times married, and that children were born to him by the wife of each of these marriages. The children of the first and second marriages are the plaintiffs, and those of the third marriage are the defendants, in the second suit.   The object of the second suit is to

compel a distribution of the estate of Rene Fitzpatrick equally among the children of the three marriages, and to invoke from the courts the construction of a certain instrument of writing, dated in January, 1843. The first question for our determination presented by this record is, were the two suits properly consolidated? And we answer this question by saying that the suits are not between the same parties, they do not relate to the parties in the same right, they are not founded upon the same subject matter, they necessarily require different judgments, and therefore could not be legally consolidated into one suit; and for this error of the court alone the judgment of the District Court must be reversed.

But to avoid the discussion of all questions unnecessary to the proper decision of this case, we at once proceed to the examination of the written instrument, signed by Felix G. Fitzpatrick, Isaac Browning, Rene Fitzpatrick and Mildred Fitzpatrick by her husband Rene, found at page 77 of the transcript of the record. On the proper construction of this instrument should depend the ruling of the court on the defendant's demurrer to the plaintiff's petition. On this demurrer the law of the case should have been forever settled; but we are clearly of the opinion that the District Court erred in overruling the demurrer, and the question is now open before us. The evidence in the case might very well justify the conclusion that no significance whatever should be given to the so called deed of trust already referred to; that Rene Fitzpatrick and wife, or Rene alone, were the true and lawful owners of the property which this instrument purports to convey in trust for certain uses; that Browning had no real interest in the property at the time he conveyed it; and that no money ever actually passed from Felix G. Fitzpatrick to anybody. But this view of the case would not materially alter the rights of the

parties if we treat the so called deed of trust as *bona fide* the declaration of an expressed trust. We will not then assume that there was any fraud or shuffle intended by this deed. It was then the declaration of an expressed trust, and we need not consider whether the signature of Mildred Fitzpatrick, written by her husband, was properly obtained to this instrument or not. The only light· in which this question could figure in the case relates to· the record of the instrument and its production in evidence by a certified copy. We do not think the instrument was entitled to record, and the court therefore erred in admitting proof by a certified copy. But no notice· need be taken further of this error. To get at the legal status of the parties to these suits, we will notice that the property now in controversy must be regarded as the profits and accumulations arising from the labor of the slaves and mules which form the original *corpus* of the property conveyed by the trust deed. The slaves having ceased to be property, they and their children, if they had such, are not here in controversy.

If the property which passed under the deed of trust had remained such at the death of both Rene and Mildred Fitzpatrick, there can be no doubt but that it would be subject to division among all the children of Rene Fitzpatrick, share and share alike; but the property here in question is an accumulation of surplus profits after all the uses and conditions of the deed had been fully satisfied.

Rene and Mildred Fitzpatrick took a life estate in this· property, with a beneficial interest, conditioned that the· property should be used for their own support and maintenance, and that of the children. These uses have been satisfied, and a surplus remains, accumulated by the careful and thrifty management of the trustees. We cannot hold that any resulting trust in favor of the grantor ·

or donor, Browning, attaches to this surplus. Such might have been the case if Rene and Mildred had not taken the trust beneficially; but we believe no case can be found where a resulting trust has attached to the surplus in the hands of the trustee, who took beneficially, after the uses declared had been fully satisfied.

We will not here refer to authorities, as they are quoted correctly in the briefs; and now the only question which remains on this branch of the case is as to the proper construction of the word *increase* as used in the trust deed.

In Howard v. York, 20 Texas, 570, the court applied this term to the young of cattle produced in the order of nature; but in the case of De Blane v. Lynch, 23 Texas, 26, the court settled this question, and this case was again affirmed in Forbes v. Dunham, 24 Texas, 611. Cotton produced by the labor of the wife's slaves was held as community property, subject to the execution for the debts of the husband. The cotton was raised on the land of the wife, and was held not to be the increase either of the land or of the slaves, but the product of their labor, and as such community property. Apply this principle to the case at bar, and the fund in controversy must be regarded as the community property of Rene and Mildred Fitzpatrick, and divided among their heirs accordingly; the half belonging to Rene Fitzpatrick must be divided among all his children, and the half belonging to Mildred must be divided among her children, to the exclusion of the children of the former marriages.

Touching the land claimed by H. C. Fitzpatrick, the right and title must be determined by the facts. If Rene Fitzpatrick purchased this land with money belonging to the community estate, though he purchased it in his wife's name, it would be community property, unless such an adverse possession be proved in the wife and

those claiming under her as would give title by prescription. But we do not see how the wife, living with her husband and occupying the land as the common home of the family, can establish such an adverse possession.

For the reasons herein given, the judgment of the District Court is reversed and the cause remanded.

REVERSED AND REMANDED.